1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT

8

EASTERN DISTRICT OF CALIFORNIA

9

10   STACEY DANIELLA DYER,                )   1:09-CV-00150 OWW SMS HC
                                          )
11              Petitioner,               )   FINDINGS AND RECOMMENDATION
                                          )   REGARDING PETITION FOR WRIT OF
12        v.                              )   HABEAS CORPUS
                                          )
13                                        )
     TINA HORNBEEK,                       )
14                                        )
                Respondent.               )
15   _____)

16
17        Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

18   pursuant to 28 U.S.C. § 2254.

19                              **PROCEDURAL BACKGROUND**

20        Petitioner is currently in the custody of the California Department of Corrections pursuant to

21   a judgment of the Superior Court of California, County of Fresno, following her conviction by jury

22   trial on May 19, 2004, of first degree felony murder with a true finding of the special circumstance

23   that the murder was committed during a robbery, kidnaping and carjacking. (LD[1] 1:2.)  Petitioner

24   was also found guilty of robbery and kidnaping. (LD 1:2.) Also, the jury found true an arming

25   allegation. (LD 1:2. ) On June 17, 2004, Petitioner was sentenced to serve a term of life without the

26   possibility of parole. (Petition at 1.)

27        Petitioner timely appealed to the California Court of Appeals, Fifth Appellate District

28   _____
     [1]"LD" refers to the documents lodged by Respondent with her response.

1  (hereinafter "Fifth DCA"). On March 12, 2007, the judgment was affirmed in a reasoned opinion.

2  (LD 1.) Petitioner then filed a petition for review in the California Supreme Court. (LD 7.) On June

3  20, 2007, the petition was summarily denied. (LD 8.)

4        On July 24, 2008, Petitioner filed a habeas petition in the Fresno County Superior Court. (LD

5  9.) The petition was denied on July 22, 2008, in a reasoned decision. (LD 10.) Petitioner then filed a

6  habeas petition in the Fifth DCA, on July 31, 2008. (LD 11.) The Fifth DCA denied the petition on

7  August 21, 2008. (LD 12.) On October 15, 2008, Petitioner filed a habeas petition in the California

8  Supreme Court. (LD 13.) The petition was summarily denied on April 1, 2009. (LD 14.)

9        On December 22, 2008, Petitioner filed the instant federal habeas petition.  Petitioner raises

10  the following grounds for relief: 1) The trial court erred by denying her motion to suppress her

11  statement to police; 2) There was insufficient evidence to support the convictions; 3) The admission

12  of the statements and conversations of co-defendants violated her Sixth Amendment right to

13  confrontation; 4) Petitioner's right to present a defense was violated when the trial court refused to

14  instruct the jury on the lesser offense of accessory after the fact; 5) The trial court erred by failing to

15  sua sponte instruct on the lesser offenses of second degree murder and voluntary manslaughter; 6)

16  The trial court erred by limiting the cross-examination of a witness; 7) Petitioner seeks to join

17  arguments raised by her co-defendants in separate cases; 8) Defense counsel was ineffective in

18  failing to conduct a reasonable investigation and for failing to interview Petitioner prior to the

19  motion to suppress Petitioner's statements; and 9) The trial court erred by failing to remove a

20  hearing-impaired juror for cause. Ground number seven was raised in the petition but dismissed by

21  the undersigned on February 26, 2009. Respondent filed an answer to the petition on June 12, 2009,

22  and Petitioner filed a traverse on July 15, 2009.

23                          **FACTUAL BACKGROUND**[2]

24        On March 21, 2002 19-year-old D.J. left his home in Fowler at approximately 6 p.m.
He was driving his 2000 pickup truck. The car had been fixed up, including custom wheels

25  and a stereo system. D.J. spent the evening at the home of his friend Carlos Rodriguez. They
watched television, had a couple of drinks and at one point went out to get some food. D.J.

26  had $5 in cash at that time. D.J. left to return home at approximately 1 a.m.

27  _____

28      [2]The factual background is taken from the opinion of the state appellate court and is presumed correct. 28
U.S.C. § 2254(e)(1).

Paul Bedrosian, a friend of D.J.'s, was driving home on March 22, 2002 at approximately 1 a.m. He saw D.J. driving in his truck by himself. He waved to D.J.

**Testimony of Ramiro Roman**

Ramiro Roman agreed to plead guilty to one count of robbery in exchange for his truthful testimony against the defendants.

Roman was living in the back room of his family's home on March 21, 2002. Alfred Cruz came over during the afternoon. They smoked some marijuana together. Over the telephone, Roman spoke to Delores Cruz, his girlfriend and Alfred's sister, at approximately midnight. As Roman left his house to walk over to Delores house, he saw Dyer at the corner of the carport. Dyer asked for Roman. Roman replied that he was Roman. Dyer said that Lopez needed him out front. Roman returned to his room and called Cruz to come out also and see what Lopez wanted.

Lopez was in a truck with Dyer. Roman asked Lopez where he got the truck. Lopez said it was his. Roman did not believe him and again asked him where he got the truck. Lopez responded, "I jacked it." Lopez told Roman that the victim was in the bed of the truck under the truck bed cover, but Roman did not believe him. Roman said he was leaving and he would be back.

Roman met Delores. He told her about the stolen truck and they walked back to his house. When they arrived, Lopez and Dyer were outside by the bed of the truck; Cruz was in Roman's room. Roman told Lopez and Dyer to leave because his mother was home. Lopez said he was waiting for someone and then they would leave. Delores went to the back room.

Roman looked in the truck. Roman tried to work the hydraulics on the truck. Roman told Lopez that if they were going to be there for a while, he was going to move the truck. Roman moved the truck away from the house. Roman told Lopez and Dyer he was going to take the stereo out of the truck. Lopez did not want Roman to take anything or mess up the truck. Roman went to his room to get tools and gloves to remove the stereo.

Cruz looked through the truck while Roman removed the stereo and amplifiers. Roman took the items to his room and hid them in the basement. Lopez said he was going to come back and get the speakers.

Lopez handed Roman D.J.'s wallet. Roman looked through it and threw identification and other papers into a barrel. During the course of the evening several of those present used Roman's portable home phone.

Roman asked Lopez where the other people were, since it had been one or two hours since Lopez arrived at Roman's house. The others arrived in a light blue van. Those in the van included Martin Castro, Jose Romero, defendant Ortega and one other person.[FN1]

FN1. Castro and Romero were convicted of the first degree murder of D.J. in a separate trial. Their convictions have been affirmed on appeal.

The group left with Dyer, Ortega, and the unidentified person in the truck. The others followed in the van. Roman and Cruz stayed at Roman's house.

Lopez called at approximately 6 a.m. that morning. Roman asked him what happened to the owner of the truck. Lopez said he "ate dirt." Lopez came over a couple of days later to get the stereo speakers. Lopez did not know that Roman had switched the stolen speakers with cheaper speakers. Roman kept the stolen speakers for himself. Roman burned the items

1   he had removed from D.J.'s wallet.

2   **Testimony of Alfred Cruz**

3   While being tried in a separate and earlier proceeding for the murder of D.J., Cruz
    agreed to plead guilty to one count of robbery in exchange for his truthful testimony against
4   the remaining defendants.

5   Cruz was at Roman's house watching television on March 21, 2002. Roman left
    sometime around midnight to get Delores. Roman came back about 45 minutes later and then
6   left again. Roman said there was someone outside. Lopez and a female, Dyer, were outside in
    a nice truck. Cruz asked Lopez where he got the truck and Lopez said he "jacked it." The
7   keys were in the ignition. Lopez asked to use the telephone to call Martin Castro. Lopez told
    Castro to come to Roman's.
8
    Lopez told Cruz that the victim tried to rape Dyer so they beat him up and threw him
9   in the back of the truck. Lopez told Cruz to talk to D.J.

10  Roman moved the truck to the side of the house. Roman said he was going to take the
    stereo out of the truck. Lopez did not want Roman to do so, but Roman did it in any event.
11  Lopez wanted everything in the truck because his "homies" were going to come.

12  They got tools and removed items from the truck. Dyer was talking to D.J. and asked
    him for his cell phone number. Cruz saw Dyer talking on the phone. Lopez told Cruz to ask
13  D.J. for his wallet. Cruz did and D.J. threw the wallet out from under the truck bed cover.
    Cruz handed items from the wallet to Roman. There was no money in the wallet. Lopez
14  asked D.J. for money but he said he did not have any. Lopez told D.J. to throw the money out
    or they were going to kill him. D.J. was moaning and asking why. Roman threw items from
15  the wallet into a barrel.

16  A light blue van pulled up to Roman's house. Ortega was in the van. Ortega handed a
    gun to Dyer. Lopez told Cruz they were going to tie up D.J. and throw him in a field. Dyer
17  got into the truck with the gun. Lopez later said they were going to kill D.J.

18  Ortega drove off in the truck with Dyer sitting in the middle and one other man in the
    truck. Lopez drove the van, with others inside. They left about 3:45 a.m.
19
    In the afternoon Lopez called and said "they had to do him." Lopez said that D.J.
20  knew too much.

21  **Evidence from Nonaccomplice Witnesses**

22  Juan Hernandez was driving to work about 5 a.m. when he saw a light van followed
    by a nice truck. At approximately 5:30 a.m. Harry Stackhouse heard gunshots. Within a
23  minute of hearing the gunshots, he saw a blue van speeding away. He then saw smoke.
    Another neighbor heard gunshots and called 911.
24
    Deputy Sheriff David Cunha was dispatched at 5:53 a.m. to a call of gunshots and
25  smoke. He arrived at 6:01 a.m. to find D.J.'s truck engulfed in flames. The fire department
    arrived quickly and put out the fire. After the fire was extinguished the cover over the bed of
26  the truck collapsed and Cunha could see a burned human body. He requested additional units.
    Three of the custom tires on the truck were missing. One tire that had a bent lug nut
27  remained.

28  An investigation revealed that flammable liquids had been used to accelerate the fire.

D.J. died from three gunshot wounds to the head. Two projectiles were recovered from his body. He had very significant burns to his body, but no soot or carbon in his airway. There was hemorrhage along the gunshot wounds indicating that D.J. was alive when all three shots were fired, but was dead before his body was burned. The projectiles recovered from D.J.'s body were fired from the same firearm.

On the morning of March 22, 2002, Beau Vang arrived at his business. Inside the fenced parking lot he found a cell phone. He thought the phone might have been dropped by one of his customers. He brought the phone inside and answered it when one of D.J.'s friends called looking for D.J. The friend relayed the information to D.J.'s mother, and she told law enforcement. Law enforcement went to Vang's place of business and retrieved the phone. The phone belonged to D.J.

Cell phone records from D.J.'s phone were retrieved. Beginning approximately 1:27 a.m. on March 22, 2002 and ending at 4:16 a.m. a number of phone calls were made to and from D.J.'s cell phone. The first call was from D.J.'s phone to Ortega's pager. Calls were made to Lopez's pager, Roman's phone and Dyer's apartment. Calls were received from various places including several calls from Lopez's home to the cell phone.

Augustina Lopez, defendant Lopez's sister, testified that Lopez lived in the same house as she did. Martin Castro, her nephew and previously convicted codefendant, also lived there. She testified that her phone rang a lot during the night of March 21, 2002. Dyer was calling and asking for Ortega. Lopez was not there when Dyer called. Ortega showed up at the house between 2 and 3 a.m. and used the phone. (Three calls were made from the Lopez home to D.J.'s cell phone, at 2:17 a.m., 2:18 a.m. and 4:14 a.m.) Augustina testified that numerous calls were received between midnight and 5 a.m.

Fresno County Sheriff's officers had stopped a blue van owned by Gabriel Rojas on March 21, 2002. The driver was Ortega; Dyer was the passenger. The same van was stopped on March 22, 2002. Rojas was the driver and Ortega was a passenger.

Based on the telephone records and other evidence, several search warrants were issued and several defendants were arrested and/or detained. Speakers matching the speakers stolen from D.J.'s vehicle were found in the basement of Roman's house.

Officers searched a van on the property where Castro and defendant Lopez lived. They found shell casings and live rounds in the van with bunter marks that matched the casings found at the crime scene. An average bunter makes 100,000 casings.

**Statements and Recorded Conversations from the Defendants**

Dyer was detained and questioned. She admitted that she had been in the blue van and she said that she knew who D.J. was. She initially told law enforcement that on the night of D.J.'s murder she was at home taking care of her children. After further questioning, she stated that she left her home at approximately midnight with a man who called himself Adam and a woman named Laurie. D.J. was following them. Adam told Dyer to get out and ask D.J. if he wanted to party with them. She did so, and D.J. declined the invitation. Adam then took off, leaving Dyer at D.J.'s truck. Dyer asked D.J. for a ride, and they tried to catch up to Laurie and Adam. They stopped by a house, and Adam and a person from the house came out and started hitting D.J., forcing him into the back of his truck. Adam, the other person and Dyer got into the cab of the truck and drove off. Dyer said she wanted to go home. They took her home and told her to keep her mouth shut. Dyer denied being present when the truck was stripped or having anything to do with the killing.

Ortega was questioned by police. He said he did not know anything about the murder

of D.J. He said that he spent the early morning hours of March 22, 2002 in Dinuba stealing car radios. He was in the blue van when he stole the radios. After stealing the radios he went to his brother's house and did not go out again.

Ortega and Dyer were placed in adjoining holding cells after they were questioned by police. They professed their love for each other. Ortega asked Dyer to not break down on him. Dyer responded she would not break down. Ortega told Dyer that she knew it was not her, and she does not know anything. He advised her not to add to the story. Dyer said she wanted to marry Ortega. Ortega assured Dyer he was going to marry her.

Lopez was questioned by police. He said he did not kill anyone. He was home, went a few places, and then returned home on the night/morning in question. He said that a truck was at his house a few minutes but he did not even talk to the person in the truck. Another truck pulled up with it and a few people got out of the second truck. Lopez said he believed the truck got "jacked" somewhere and then taken to his house. Lopez left with a couple of females. Then he came home and called it a night. Officers pressed Lopez for the name of a female involved. He did not give a name. He said a girl came to his house with D.J. and they wanted some weed. Lopez did not think the guy had been carjacked because he was with the girl that came to his house. Lopez and the girl took off and went looking for weed. They went to a friend's house on the west side; Lopez said he came back with someone else. Lopez thought the girl wanted to use D.J. to get high and use his truck to cruise around in.

Lopez called his sister from jail. During their conversation, Lopez said that the guy (D.J.) came to his house with a girl. He informed his sister that he told officers he left with them and they were trying to get some weed. Lopez told his sister they went to Roman's house and D.J. was in the other truck cruising around. At that time the girl said forget the guy, "let's just get his beat [stereo]." Lopez said they took out his stereo. Others arrived in another truck and Lopez went home.

(LD 1:2-8.)

## DISCUSSION

### I. Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn.7 (2000). Petitioner asserts that she suffered violations of her rights as guaranteed by the U.S. Constitution. In addition, the conviction challenged arises out of the Fresno County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2254(a); 2241(d). Accordingly, the Court has jurisdiction over the action.

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008 (1997); Jeffries v. Wood, 114

1  F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert.*

2  *denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997)

3  (holding AEDPA only applicable to cases filed after statute's enactment).  The instant petition was

4  filed after the enactment of the AEDPA; thus, it is governed by its provisions.

5  **II.  Legal Standard of Review**

6       This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody

7  pursuant to the judgment of a State court only on the ground that [s]he is in custody in violation of

8  the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

9       The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death

10  Penalty Act which became effective on April 24, 1996.  Lockyer v. Andrade,  538 U.S. 63, 70

11  (2003).  Under the AEDPA, an application for habeas corpus will not be granted unless the

12  adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable

13  application of, clearly established Federal law, as determined by the Supreme Court of the United

14  States" or "resulted in a decision that was based on an unreasonable determination of the facts in

15  light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); see Lockyer,

16  538 U.S. at 70-71; see Williams, 529 U.S. at 413.

17       As a threshold matter, this Court must "first decide what constitutes 'clearly established

18  Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71,

19  *quoting* 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this Court

20  must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time

21  of the relevant state-court decision." Id., *quoting* Williams, 592 U.S. at 412. "In other words, 'clearly

22  established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by

23  the Supreme Court at the time the state court renders its decision." Id.

24       Finally, this Court must consider whether the state court's decision was "contrary to, or

25  involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72,

26  *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the

27  writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

28  question of law or if the state court decides a case differently than [the] Court has on a set of

1   materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72.

2   "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state

3   court identifies the correct governing legal principle from [the] Court's decisions but unreasonably

4   applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

5         "[A] federal court may not issue the writ simply because the court concludes in its

6   independent judgment that the relevant state court decision applied clearly established federal law

7   erroneously or incorrectly.  Rather, that application must also be unreasonable." Id. at 411.  A

8   federal habeas court making the "unreasonable application" inquiry should ask whether the state

9   court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

10        Petitioner has the burden of establishing that the decision of the state court is contrary to or

11  involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle,

12  94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the states,

13  Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court

14  decision is objectively unreasonable.  See Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th

15  Cir.1999).

16        AEDPA requires that we give considerable deference to state court decisions. The state

17  court's factual findings are presumed correct, 28 U.S.C. § 2254(e)(1), and we are bound by a state's

18  interpretation of its own laws. South v. Schaivo, 289 F.3d 616, 621 (9th Cir.2002), cert. denied, 537

19  U.S. 859 (2002), rehearing denied, 537 U.S. 1149 (2003).

20  **III.  Review of Petition**

21        **A.  Ground One**

22        In her first claim, Petitioner contends the trial court erred in denying her motion to suppress

23  her statement to the police.

24        This claim was presented on direct appeal to the Fifth DCA, where it was rejected in a

25  reasoned opinion. (LD 1:15-20.) Petitioner then presented the claim to the California Supreme Court

26  where it was summarily denied. (LD 7, 8.) The California Supreme Court, by its "silent order"

27  denying review of the Fifth DCA's decision, is presumed to have denied the claim presented for the

28  same reasons stated in the opinion of the Fifth DCA.  Ylst v. Nunnemaker, 501 U.S. 797, 803

1   (1991).

2        Prior to trial, Petitioner made a motion to exclude her statement to police, claiming she was

3   not given her Miranda[3] warnings. The trial court denied the motion, relying on the following factual

4   findings:

5        First of all, [Petitioner] was first approached by Detective Chapman and Rasmussen outside
        [Petitioner's] residence as she sat unhandcuffed in a sheriff's car. They asked at that time if
6        they could interview her, and she essentially consented. Though she was transported to the
        sheriff's department by sheriff's vehicle, there is no evidence that she was handcuffed during
7        that transportation. Although, it appears that she might have been in a locked portion of the
        vehicle. We don't really have clear evidence of that. Before and during the interview she was
8        not told that she was under arrest. At headquarters and in the interview she was told she was
        free to leave. And that's clearly indicated in the transcript at page two where the detective
9        states, "Okay. And you understand that you are not in any trouble, you're not under arrest,
        and that you're free to leave at any time?" And [Petitioner] answer[ed], "Uh-huh," and
10       indicated affirmatively. During that interview there's a break at approximately – looked like
        about an hour or so into the interview. And that included [Petitioner] going to the bathroom
11       and water fountain unattended and not restrained in any way walking down the hall and so
        forth for about five minutes or so. There was another break at 3:01 in the morning. And the
12       end of the interview is at 4:01 or 4:07. It was unclear in the testimony. But some time. It
        appeared that the entire interview was about four hours at the police headquarters.
13       Throughout the interview [Petitioner] appears to respond, first making sounds such as uh-huh
        and making some comments later indicating fear of others. But not the officers, necessarily.
14       But she continues to respond to their questions. There is little evidence that the defendant
        was deprived of her freedom, and no evidence that she was lead to believe that she was so
15       deprived of any freedom. We don't have review on this except transcript where she indicates
        she understands she's free to leave. The fact Officer Chapman considered her a suspect or
16       might arrest her is not necessarily relevant to this consideration. Again, the Courts note there
        had - - was no formal arrest prior to or during the questioning or restraint of her movement
17       that is indicated in the record.

18   (See Ortega v. Evans,[4] Case No. 1:08-CV-00894 LJO DLB HC, RT 3003-3004.)

19        The appellate court analyzed and rejected the claim as follows:

20             Sheriff Detective Mark Chapman testified at the hearing. He was the primary
        investigative officer of this murder case. A search warrant was obtained for Dyer's residence
21       and was executed at approximately 10:35 p.m. on March 28, 2002. Dyer was not home when
        the warrant was executed. She arrived home approximately five minutes later.
22
             Chapman arrived at Dyer's apartment after the warrant had been executed. When he
23       arrived, he found Dyer seated in the back seat of Deputy Simpsom's patrol car, which was
        parked in the alley outside of Dyer's apartment. The doors to the patrol car were closed and
24       Dyer could not open them from the inside of the back seat. Chapman could not recall if the
        car was unattended at the time he arrived. Chapman contacted Dyer and told her he was
25       conducting an investigation. Neither Chapman nor his partner, Detective Rasmussen, was in

26   _____

27       [3]Miranda v. Arizona, 384 U.S. 436 (1966).

28       [4]The Court refers to the state court records lodged by Respondent in Ortega v. Evans, Case No. 1:08-CV-00894 LJO
    DLB HC. The petitioner in Ortega is Petitioner's co-defendant and the records submitted in that case are of the joint trial.

uniform. They did not display a firearm to Dyer. Chapman asked her if she would mind coming to the sheriff's department to speak to "us." She was agreeable. Dyer was transported to the department and her interview began approximately 30 minutes later. She was in the patrol car for over an hour, at the apartment and in transit from her apartment in Fowler.

Dyer was never handcuffed nor was she told she was under arrest. At the outset of the interview, Dyer was told she was not in custody and she was free to leave. The interview room was approximately 15 feet by 15 feet. It contained chairs, a table, and a trash can. Dyer was not under the influence of drugs at the time of the interview. The interview lasted 3 hours and 45 minutes. Two breaks were taken during the interview, one at 1:54 a.m. and one at 3:01 a.m. During the first break Dyer got up, left the room, walked to the restroom (approximately 30 yards away), used the restroom, and returned to the interview room. At each break, Dyer said that no promises or threats had been made to her. For the first hour and a half of the interview, Dyer denied all knowledge and involvement. She later admitted that she had some contact with D.J. on the evening of the 21st. Dyer said she wanted to go home. She was arrested.

During their interview of Dyer, the officers told her that they knew "pretty much" where she was and what she was doing. They told her that people had told them that she was the one that killed D.J.

The trial court denied the motion to suppress, finding that Dyer was not under arrest at the time of her statement and a reasonable person in her position would not have felt she was in custody or restrained from departing at will. In particular, the court found Dyer was not handcuffed and she consented to come to the station for an interview. Additionally, the court said there was not clear evidence that she was in a locked portion of the vehicle. The court relied on the facts that Dyer was told she was free to leave and she acknowledged that she understood that. She was allowed to go freely to the bathroom and water fountain and was gone from the interview room for approximately five minutes. Dyer responded to the officers' questions without any hesitation.[FN3]

> FN3. Dyer sought to relitigate the motion several days later. She claimed that if she testified she would say that a detective went with her to the bathroom. In addition, she disputed the court's finding that she was not in a locked patrol car the entire time. The court denied the motion to revisit the motion but clarified that it found that there was no evidence Dyer was in the back seat of the patrol car when she was transported to the sheriff's station. Dyer does not challenge the trial court's ruling that it would not reopen the suppression motion.

Dyer claims the trial court erred in denying her motion to suppress her statement because her statement was given under circumstances indicating that she was in custody for *Miranda* purposes. In particular she argues that "[s]he was detained by many officers executing the search warrant at her home, she was kept in the back of a locked patrol car for an hour, she was accused and confronted repeatedly with evidence of her guilt, including being the actual killer, in a barren and windowless room at the Sheriff's Department by two detectives during a four-hour long interrogation. Under the totality of the circumstances, no reasonable person would have felt free to leave at any time during the five-hour period beginning with the initial detention to the time of her formal arrest."

"We review independently a trial court's determinations as to whether coercive police activity was present and whether the statement was voluntary. [Citation.] We review the trial court's findings as to the circumstances surrounding the confession, including the characteristics of the accused and the details of the interrogation, for substantial evidence. [Citation.] '[T]o the extent the facts conflict, we accept the version favorable to the People if supported by substantial evidence.' [Citation.]" (*People v. Guerra* (2006) 37 Cal.4th 1067,

1   1093, 40 Cal.Rptr.3d 118, 129 P.3d 321.)

2       "After being taken into custody by police or otherwise deprived of his or her freedom of action in any significant manner, a person must be given *Miranda* warnings apprising the

3   person of his or her right to remain silent, that any statement the person makes may be used against the person and that the person has the right to counsel, retained or appointed.

4   [Citation.] Statements elicited in noncompliance with this rule may not be admitted for certain purposes in a criminal trial. [Citation.]" (*In re Kenneth S.* (2005) 133 Cal.App.4th 54,

5   63, 34 Cal.Rptr.3d 430.)

6       "The due process [voluntariness] test takes into consideration 'the totality of all the surrounding circumstances-both the characteristics of the accused and the details of the

7   interrogation.' " (*Dickerson v. United States* (2000) 530 U.S. 428, 434, 120 S.Ct. 2326, 147 L.Ed.2d 405.) " *Miranda* made clear that the rule was only applicable to custodial

8   interrogation, which means, 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant

9   way.' [Citation.] In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but the ultimate inquiry is simply

10  where there was a " 'formal arrest or restraint on freedom of movement' " of the degree associated with a formal arrest.' [Citation.]" (*In re Kenneth S., supra,* 133 Cal.App.4th at p.

11  64, 34 Cal.Rptr.3d 430.)

12      Dyer was not arrested at the time her interview took place. Although Chapman testified that he intended to arrest Dyer after the interview, this information was not conveyed

13  to Dyer. It is the objective circumstances of the interrogation, not the subjective intention of the officer that is evaluated in determining if the individual was in custody at the time she

14  was questioned. ( *Berkemer v. McCarty* (1984) 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317.)

15

16      Chapman informed Dyer that the investigators had information linking her to the killing and even had information that she was the killer. He said that others had talked, thus

17  she should give her side of the story. While an officer's beliefs may bear on the custody issue, if those beliefs are conveyed to the individual being questioned, "[e]ven a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself,

18  dispositive of the custody issue, ..." (*Stansbury v. California* (1994) 511 U.S. 318, 320, 114 S.Ct. 1526, 128 L.Ed.2d 293.) While Chapman told Dyer that she was strongly linked to the

19  killing, he left open the possibility that others were not telling the truth and Dyer could shed light on what happened and refute the evidence already gathered from the statements of

20  others. His questioning was framed in a manner that was more investigatory than accusatory.

21      Dyer was questioned at the sheriff's station by two sheriff deputies in a fairly large room (15 feet by 15 feet). *Miranda* warnings are not required to be given merely because the

22  questioning takes place at a law enforcement location. (*Oregon v. Mathiason* (1977) 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714.) Other than the fact that the questioning took place at

23  the station, there was nothing about the surroundings that was intimidating or tantamount to a formal arrest. The two deputies questioning Dyer were not in uniform. Dyer was allowed to

24  leave the room to take a break and walk freely to the bathroom and the water fountain. Dyer was not handcuffed or otherwise restrained during the questioning. Her freedom of

25  movement was not restricted.

26      While the interview was lengthy (approximately four hours), the crime was very serious and involved numerous activities and individuals, thus requiring a lengthier

27  questioning period than would be required for a less complicated crime.

28      Dyer contends her detainment for a lengthy period of time in a locked patrol car

suggests that she was in custody for purposes of *Miranda.* The initial detention of Dyer, before Chatman arrived, has little bearing on whether her freedom of action was curtailed to a degree associated with a formal arrest. Her initial detention was because she was the occupant of a house that was being searched pursuant to a valid search warrant. A warrant to search founded on probable cause "carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." (*Michigan v. Summers* (1981) 452 U.S. 692, 705, 101 S.Ct. 2587, 69 L.Ed.2d 340.) Dyer was asked if she would come to the station to talk to the deputies. She agreed and she was transported from Fowler to Fresno in the patrol car. Thus her one hour in the back of a locked patrol car was related to the search warrant and then for voluntary transportation purposes. In such a situation, a reasonable person would not believe that the time in the patrol car was a deprivation of her freedom of action in any significant way amounting to a custodial arrest.

At the conclusion of the interview, Dyer was asked if she was going to stay at her apartment. She said she did not want to stay there because the others knew where she lived. Although the determination of whether a custodial interrogation took place is based on an objective standard, the fact that Dyer thought she was going home when the interview was completed gives credence to a finding that she was not in custody at the time she was questioned.

Based on all of the above reasons and under the totality of the circumstances, we find Dyer's statement was voluntary.

(LD 1:15-20.)

In Miranda v. Arizona, 384 U.S. 436, 444 (1966), the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."  As to the procedural safeguards to be employed, "[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Id. As to custodial interrogation, the Supreme Court meant "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id. The test to determine whether the conduct constituted custodial interrogation is an objective one. Yarborough v. Alvarado, 541 U.S. 652, 667 (2004); Stansbury v. California, 511 U.S. 318 (1994). The more a setting resembles a traditional arrest, in other words, the more constrained a defendant feels, the more likely the setting will constitute custody. See Berkemer v. McCarty, 468 U.S. 420, 441 (1984). If detention is voluntary, it cannot constitute custody. Id. On the other, detention that is long in duration and involuntary will constitute custody. See, e.g., Mathas v. United States, 391 U.S. 1 (1968).

1    In this case, the state courts reasonably applied governing Supreme Court precedent. The

2    courts determined that Petitioner had been questioned by police. Nevertheless, the courts found that

3    Petitioner was not "in custody" such that <u>Miranda</u> warnings were required prior to questioning. This

4    determination was not unreasonable. Petitioner voluntarily agreed to accompany the officers to the

5    station house. Although the setting was a police station and the interview was for an extended

6    duration, Petitioner was informed that she was not under arrest or in any trouble. She was further

7    advised on multiple occasions that she was free to leave at any time. In fact, during the interview

8    Petitioner left the room of her own accord, took a break, and went to the bathroom and water

9    fountain unattended and unrestrained. Under these circumstances, this Court does not find the state

10   court's determination that Petitioner was not in custody to be unreasonable. The claim should be

11   denied.

12   **B.  Ground Two**

13   In her next claim, Petitioner argues the evidence is insufficient to support the convictions and

14   special circumstances.

15   This claim was also presented and rejected on direct appeal to the Fifth DCA. (LD 1:20-21.)

16   Petitioner then presented the claim to the California Supreme Court where it was summarily denied.

17   (LD 7, 8.) The California Supreme Court, by its "silent order" denying review of the Fifth DCA's

18   decision, is presumed to have denied the claim presented for the same reasons stated in the opinion

19   of the Fifth DCA.  <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803 (1991).

20   In rejecting this claim, the Fifth DCA stated:

21       Dyer contends that the evidence is not sufficient to support the convictions and
         related special circumstances against her. She argues that the case against her was based on
22       mere "'suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or
         guess work.'" In particular she argues that her statement does not provide substantial
23       evidence and that, although there was evidence that she was with D.J. and was at the scene
         when his stereo was stolen, she neither did nor said anything that could reasonably be
24       construed as aiding and abetting Lopez or Romero, the "masterminds" and leaders of the
         incident.
25
         On appeal "the court must review the whole record in the light most favorable to the
26       judgment below to determine whether it discloses substantial evidence-that is, evidence
         which is reasonable, credible, and of solid value-such that a reasonable trier of fact could
27       find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557,
         578, 162 Cal.Rptr. 431, 606 P.2d 738.) Substantial evidence includes circumstantial evidence
28       and the reasonable inferences flowing therefrom. (*In re James D.* (1981) 116 Cal.App.3d

810, 813, 172 Cal.Rptr. 321.)

The evidence is more than substantial to find that Dyer was involved as a direct perpetrator or an aider and abettor in all of the crimes against D.J. Dyer admitted she was with D.J. on the night in question. She was the one who asked for Roman after she and Lopez arrived at Roman's house with D.J. trapped under the bed cover of his truck. She stood at or near the truck at all times knowing that D.J. was under the cover. She asked D.J. for his cell phone number and made calls on his phone. She called Lopez's house numerous times looking for Ortega. When Ortega showed up, he handed her the gun. She rode away in D.J.'s truck carrying the gun and sitting between Ortega and an unidentified male. D.J.'s truck was seen being followed by a blue van going to the crime scene and the blue van was seen leaving the crime scene. This evidence is more than sufficient for a rational jury to conclude that Dyer was an active participant in the crimes, and at a minimum was an aider and abettor.

(LD 1:20-21.)

In reviewing insufficiency of evidence claims, California courts expressly follow the Jackson standard enunciated in Jackson v. Virginia, 443 U.S. 307 (1979). See People v. Johnson, 26 Cal.3d 557, 575-578 (1980); see also People v. Thomas, 2 Cal.4th 489, 513 (1992). Pursuant to the Supreme Court's holding in Jackson, the test in determining whether a factual finding is fairly supported by the record is as follows:

"[W]hether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

Jackson, 443 U.S. at 319; see also Lewis v. Jeffers, 497 U.S. 764, 781 (1990).

This Court must presume the correctness of the state court's factual findings. 28 U.S.C. § 2254(e)(1); Kuhlmann v. Wilson, 477 U.S. 436, 459 (1986). This presumption of correctness applies to state appellate determinations of fact as well as those of the state trial courts. Tinsley v. Borg, 895 F.2d 520, 525 (9th Cir.1990). Although the presumption of correctness does not apply to state court determinations of legal questions or mixed questions of law and fact, the facts as found by the state court underlying those determinations are entitled to the presumption. Sumner v. Mata, 455 U.S. 539, 597 (1981).

A review of the record reveals there was overwhelming evidence of Petitioner's guilt. She admitted that she was with the victim on the night in question. The record shows she actively participated in the commission of the offenses. If Petitioner was not the individual who actually killed the victim, she was certainly an aider and abettor. Therefore, the state court determination was not contrary to, or an unreasonable application of, Federal law as determined by the Supreme Court.

1  28 U.S.C. § 2254(d). The claim must be rejected.

2  **C. Ground Three**

3  Petitioner next claims that the statements of her co-defendants were admitted into evidence in

4  violation of her Sixth Amendment right to confrontation.

5  Like the previous claims, this was presented and rejected on direct appeal in the Fifth DCA.

6  (LD 1:9-15.) The claim was then presented to the California Supreme Court where it was summarily

7  denied. (LD 7, 8.) The California Supreme Court is presumed to have denied the claim for the same

8  reasons stated in the opinion of the Fifth DCA. Ylst, 501 U.S. at 803.

9  The appellate court analyzed this claim as follows:

10  The trial court admitted the redacted statements and conversations of the three
defendants at trial. The jury was instructed not to consider the statement of one defendant

11  against the remaining codefendants. The content of these statements is set forth above in the
statement of the facts. Each defendant now claims that the trial court erred in admitting the

12  statements of their codefendants at trial. They claim that their right to confrontation has been
violated under the United States Supreme Court cases of *Bruton v. United States* (1968) 391

13  U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 and *Crawford v. Washington* (2004) 541 U.S. 36,
124 S.Ct. 1354, 158 L.Ed.2d 177.

14

15  In *Bruton,* the court held that a defendant's right to confrontation of the witnesses
against him is violated by admitting the confession of a nontestifying codefendant who names

16  and incriminates the defendant. This is so even though the jury is instructed to disregard the
confession in determining the nondeclarant defendant's guilt or innocence. "[T]here are some

17  contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and
the consequences of failure so vital to the defendant, that the practical and human limitations

18  of the jury system cannot be ignored. [Citations.] Such a context is presented here, where the
powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-

19  by-side with the defendant, are deliberately spread before the jury in a joint trial." (*Bruton v.
United States, supra,* 391 U.S. at pp. 135-136 [FN2].)

20  FN2. In 1965 The California Supreme Court reached a similar conclusion on
nonconstitutional grounds. (*People v. Aranda* (1965) 63 Cal.2d 518, 47 Cal.Rptr. 353,

21  407 P.2d 265.)

22  The holding in *Bruton* was limited in scope in *Richardson v. Marsh* (1987) 481 U.S.
200, 107 S.Ct. 1702, 95 L.Ed.2d 176. In *Richardson* "the Court considered a redacted

23  confession. The case involved a joint murder trial of Marsh and Williams. The State had
redacted the confession of one defendant, Williams, so as to 'omit all reference' to his

24  codefendant, Marsh-'indeed, to omit all indication that *anyone* other than ... Williams' and a
third person had 'participated in the crime.' [Citation.] The trial court also instructed the jury

25  not to consider the confession against Marsh. [Citation.] As redacted, the confession
indicated that Williams and the third person had discussed the murder in the front seat of a

26  car while they traveled to the victim's house. [Citation.] The redacted confession contained
no indication that Marsh-or any other person-was in the car. [Citation.] Later in the trial,

27  however, Marsh testified that she was in the back seat of the car. [Citation .] For that reason,
in context, the confession still could have helped convince the jury that Marsh knew about

28  the murder in advance and therefore had participated knowingly in the crime.

"The court held that this redacted confession fell outside *Bruton's* scope and was admissible (with appropriate limiting instructions) at the joint trial. The Court distinguished Evans' confession in *Bruton* as a confession that was 'incriminating on its face,' and which had 'expressly implicat[ed]' Bruton. [Citation .] By contrast, Williams' confession amounted to 'evidence requiring linkage' in that it 'became' incriminating in respect to Marsh 'only when linked with evidence introduced later at trial.' [Citation.]" (*Gray v. Maryland* (1998) 523 U.S. 185, 190-191, 118 S.Ct. 1151, 140 L.Ed.2d 294.) Thus, the judge's instruction to disregard the evidence in assessing the nondeclarant codefendant's guilt "may well be successful in dissuading the jury from entering onto the path of inference in the first place, so that there is no incrimination to forget." (*Richardson v. Marsh, supra,* 481 U.S. at p. 208.)

The court in *Richardson* left open the question of whether a confession would be admissible when it has been edited by replacing the defendant's name with a symbol or neutral pronoun. That question was considered by the California Supreme Court in *People v. Fletcher* (1996) 13 Cal.4th 451, 53 Cal.Rptr.2d 572, 917 P.2d 187. The court in *Fletcher* concluded that the admissibility of a confession by replacing names with a pronoun or similar neutral or nonidentifying term must be decided on a case-by-case basis. The court determined that redaction is a viable solution in a substantial number of cases. "As we have seen, redaction that replaces the nondeclarant's name with a pronoun or similar neutral and nonidentifying term will adequately safeguard the nondeclarant's confrontation rights unless the average juror, viewing the confession in light of the other evidence introduced at trial, could not avoid drawing the inference that the nondeclarant is the person so designated in the confession and the confession is 'powerfully incriminating' on the issue of the nondeclarant's guilt." (*Id.* at p. 467, 53 Cal.Rptr.2d 572, 917 P.2d 187.)

A similar conclusion was reached by the United States Supreme Court in *Gray v. Maryland, supra,* 523 U.S. at page 209. "The confession in *Gray* referred directly to the existence of the nonconfessing defendant. It was redacted by removing the defendant's name and replacing it with either the word 'deleted' or a blank space set off by commas. 'The inferences at issue here involve statements that, despite redaction, obviously refer directly to someone, often obviously the defendant, and which involve inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial. Moreover, the redacted confession with the blank prominent on its face, in *Richardson's* words, "facially incriminat[es]" the codefendant. [Citation.] Like the confession in *Bruton* itself, the accusation that the redacted confession makes "is more vivid than inferential incrimination, and hence more difficult to thrust out of mind." [Citation.]' [Citation.]" (*People v. Archer* (2000) 82 Cal.App.4th 1380, 1387-1388, 99 Cal.Rptr.2d 230.)

With this background of law in mind we separately examine each defendant's claim of erroneous admission of his or her codefendants' statements.

We begin by noting that none of the statements here were redacted by substituting blanks or symbols, thus making it obvious that a name had been removed. Also, the redaction of the statements did not result in any awkward sentences that would indicate to the jury that a person's name or other identifying information had been removed. We additionally note that because there were numerous participants in the crimes here, any generic reference to another person without any further identifying features does not single out any one individual over another. The jury was well aware that there were more participants involved than those before the court during this trial. In addition, all three defendants denied being present at the murder or knowing anything about the murder. Their statements were not powerfully incriminating against anyone causing jurors to ignore the instruction from the court limiting the use to each particular defendant who made the statement.

[¶]. . . .[¶]

Dyer argues that Lopez's statement identified her as the woman with D.J. before and at Roman's house, it identified her as the one who wanted to commit theft and kill D.J., and it identified her as the person with the gun leaving Roman's house. She argues the statement also inferentially identified her as the person who shot and killed D.J. As such, she argues it was error to admit the redacted statements of Lopez.

Dyer grossly exaggerates the evidence contained in Lopez's statements identifying her. Lopez never named anyone in his actual statement and thus no redaction of names was necessary. Because Dyer was the only female on trial, there was an inference that she could be the female he was talking about, although he referred to more than one female during the course of the evening. In any event, Lopez's statement coincides with Dyer's statement that she was with D.J., rode in his truck, and went to a location with another truck. Dyer's statement provided this information without resort to Lopez's statement. Even if we were to conclude that Dyer is implicated in Lopez's statement, because he referred to at least two females the only criminal implication arose from Lopez's conversation with his sister. In that conversation he said that a female took part in taking the stereo from the truck when D.J. was not around. Lopez did not implicate the female in leaving with the others when they took D.J.; in fact, during his statement to police, Lopez said that the girl went home before any inappropriate activities took place. Lopez's statement was thus more favorable to the implicated female than Dyer's statement when she said that she was there when D.J. was beaten and then asked to be taken home. Lopez's statement was not so powerfully incriminating against Dyer such that the jury would not follow the court's instruction to consider it only against Lopez. Even if we assume that Lopez's statement was inferentially incriminating against Dyer, it was far less incriminatory than Dyer's own statement and any error would be harmless.

In addition to *Bruton* error, each defendant also claims that the admission of his or her codefendants' statements at trial was error under the recent United States Supreme Court case of *Crawford v. Washington, supra*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177. In *Crawford* the court held that, with certain exceptions, out-of-court testimonial statements are inadmissible at trial under the confrontation clause unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the declarant. Statements, such as those in question here, that are elicited during a police interrogation are testimonial and if admitted against the nondeclarant would fall within the *Crawford* rule of inadmissibility.

*Crawford* is not applicable here because, as previously discussed, it is reasonable to presume that the jury followed the trial court's instructions to only consider the statements against the declarant defendant and not against the nondeclarant defendants. Because the statements were properly admitted under *Bruton* and their admissibility was limited to only the declarant defendant, the testimonial evidence was not admitted against the nondeclarant defendants and the right to confrontation is not involved. The nondeclarant defendants had no need to engage in cross-examination because the testimonial evidence was not admitted against them. (See *People v. Song* (2004) 124 Cal.App.4th 973, 984, 22 Cal.Rptr.3d 118.)

(LD 1:9-15.)

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. am. VI. The Sixth Amendment's Confrontation Clause was made applicable to the states through the Due Process Clause of the Fourteenth Amendment. Pointer v. Texas, 380 U.S. 400, 403-05 (1965). In Bruton v. United States, 391 U.S. 123 (1968), the Supreme Court held that a

1    defendant is deprived of his constitutional rights under the Confrontation Clause of the Sixth

2    Amendment when a non-testifying co-defendant's confession "expressly implicating" the defendant

3    is introduced at their joint trial, even where the jury has been given a limiting instruction.

4         However, Bruton's scope was limited by <u>Richardson v. Marsh</u>, 481 U.S. 200, 211 (1987), in

5    which the Supreme Court held that the admission of a non-testifying co-defendant's confession does

6    not violate the Confrontation Clause when a proper limiting instruction is given and "the confession

7    [is] not incriminating on its face [but becomes] so only when linked with evidence introduced later at

8    trial." In <u>Richardson</u>, the Court held that admission of a non-testifying co-defendant's confession did

9    not violate the defendant's right under Confrontation Clause where the court instructed the jury not to

10   use the confession in any way against the defendant, and the confession was redacted to eliminate

11   not only the defendant's name, but any reference to his existence. <u>Id</u>. at 211. Moreover, not all

12   extrajudicial statements or confessions need be excluded from use at trial.  Rather, "only those

13   statements that 'clearly inculpate' the defendant or are 'powerfully incriminating' implicate the

14   'Bruton' rule." <u>United States v. Yarbrough</u>, 852 F.2d 1522, 1537 (9th Cir.1988), *quoting* <u>Richardson</u>,

15   481 U.S. at 200.

16        In this case, the state court applied governing Supreme Court precedent and did so

17   reasonably. Lopez's statement did not directly implicate or clearly inculpate Petitioner, nor was the

18   statement powerfully incriminating toward Petitioner. As thoroughly discussed by the appellate

19   court, Lopez's redacted statement did not refer to Petitioner by name, and there were no blanks or

20   symbols used in place of Petitioner's name which would have made it obvious to the jury that

21   Petitioner's name had been removed. In addition, the redaction of Lopez's statement did not result in

22   awkward sentences which might also have caused the jury to speculate on the missing references.

23   Further, there were numerous participants in the crime in addition to the co-defendants at the trial,

24   including females. In fact, Lopez referred to multiple females during the course of the evening.

25   Therefore, his statement did not lead directly to Petitioner's identity as the lone female. Moreover,

26   the jury was given limiting instructions prohibiting the use of each defendant's statement against the

27   co-defendants. Accordingly, the state courts reasonably applied governing Supreme Court precedent

28   in rejecting Petitioner's claim.

Petitioner's claim of a violation of his Sixth Amendment due process rights under Crawford v. Washington, 541 U.S. 36 (1998) fares no better. In Crawford, the Supreme Court held that, with exceptions, out-of-court testimonial statements are inadmissible at trial against nondeclarant defendants under the Sixth Amendment confrontation clause. However, as pointed out above and by the state courts, the statements and conversations were not admitted against the nondeclarant defendants. They were specifically limited to only the declarant defendants. In addition, the statements and conversations were redacted to exclude any reference to the nondeclarant defendants. For these reasons, Crawford is inapplicable in this case. The state courts reasonably rejected Petitioner's claim.

**D. Ground Four**

Petitioner contends the trial court erred by failing to instruct the jury on the lesser offense of accessory after the fact. Respondent contends the claim is unexhausted, because Petitioner failed to raise it in her petition for review to the California Supreme Court. Respondent reserves this argument, but urges the Court to address it because it is clearly meritless. 28 U.S.C. § 2254(b)(2).

Petitioner raised the claim before the Fifth DCA. The Fifth DCA analyzed the claim and rejected it as follows:

> Dyer and Ortega requested the court to instruct the jury on accessory after the fact pursuant to CALJIC No. 6.40. Their request was based on two theories. First, they wished to have the instruction given as a lesser related instruction. Next, they wanted the instruction given as a pinpoint defense instruction. The trial court refused to give an instruction on accessory after the fact.

> CALJIC No. 6.40 provides: "Defendant is accused [in Count[s] _____] of having committed the crime of being an accessory to a felony in violation of section 32 of the Penal Code.

> "Every person who, after a felony has been committed, harbors, conceals or aids a principal in that felony, with the specific intent that the principal may avoid or escape from arrest, trial, conviction or punishment, having knowledge that the principal has committed that felony or has been charged with that felony or convicted thereof, is guilty of the crime of accessory to a felony in violation of Penal Code section 32.

> "In order to prove this crime, each of the following elements must be proved:
> "1. A felony, namely _____, was committed;
> "2. Defendant harbored, concealed or aided a principal in that felony with the specific intent that the principal avoid or escape [arrest] [trial] [conviction or punishment]; and
> "3. Defendant did so with knowledge that the principal [committed the felony] [was charged with having committed the felony] [was convicted of having committed the

felony].”

Dyer asserts that she was entitled to the instruction. She claims that the evidence that supports the accessory instruction is that she tried to divert attention from herself and the other charged defendants in her statement to police, thus aiding the other defendants in escaping conviction.

Accessory after the fact is a lesser related offense to murder. “[A] trial court has no duty to instruct on an uncharged lesser related offense when requested to do so by the defendant [citation].” (*People v. Schmeck* (2005) 37 Cal.4th 240, 292, 33 Cal.Rptr.3d 397, 118 P.3d 451.) We are bound by this decision of the California Supreme Court. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455, 20 Cal.Rptr. 321, 369 P.2d 937.)

Dyer argues that even if she is not entitled to a lesser related offense instruction she is entitled to an instruction that pinpoints her defense when such an instruction was requested. A trial court is required to give pinpoint instruction upon request if the instruction is supported by substantial evidence. (*People v. Bolden* (2002) 29 Cal.4th 515, 558, 127 Cal.Rptr.2d 802, 58 P.3d 931.)

“A person may aid, or attempt to aid, the principal to a crime by making false or misleading statements to the authorities, and such conduct will support a conviction of accessory after the fact.” (*In re I.M.* (2005) 125 Cal.App.4th 1195, 1203, 23 Cal.Rptr.3d 375.) In *In re I.M.,* the defendant was found to be an accessory after the fact based on several things, including telling the police a false story about what he had seen in an effort to mitigate the evidence against the shooter, a fellow gang member. (*Ibid.*) In *People v. Duty* (1969) 269 Cal.App.2d 97, 74 Cal.Rptr. 606 the defendant was found guilty of being an accessory after he supplied an affirmative and deliberate falsehood in the form of a false alibi for the principal to the public authorities.

In her statement to police, Dyer did not affirmatively misrepresent the activities of her codefendants; her statement at most would be considered to be withholding information regarding activities. A mere withholding of information is not equivalent to supplying affirmative and deliberate falsehoods regarding the activities of others and cannot be considered evidence sufficient to support a conviction for accessory after the fact. Because the evidence would not support such a conviction or such a defense the trial court did not err in failing to give the pinpoint defense instruction.

Ortega raises the same issue on the same basis as Dyer. His argument should be rejected on this point. In addition, Ortega argues there was evidence that his involvement in the crime amounted only to attempting to dissuade witnesses after Dyer was arrested, thus he was an accessory after the fact.

Even if we assume that the evidence would support an argument that Ortega aided Dyer by attempting to dissuade witnesses after the fact, error in failing to give an accessory instruction was harmless beyond a reasonable doubt. First, Ortega was allowed to argue this theory to the jury-thus the jury was aware of the theory. More importantly, we cannot imagine that jurors would convict Ortega of first degree murder with special circumstances if they believed that he was only involved in witness intimidation after the fact. (*People v. Turner* (1990) 50 Cal.3d 668, 692-693, 268 Cal.Rptr. 706, 789 P.2d 887, *People v. Boyer* (2006) 38 Cal.4th 412, 471, 42 Cal.Rptr.3d 677, 133 P.3d 581.)

(LD 1:21-23.)

In general, challenges to jury instructions are issues of state law and are not cognizable in a

federal habeas corpus action. <u>Estelle v. McGuire</u>, 502 U.S. 62, 71-72 (1991).  To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. <u>Id</u>. at 72. Additionally, the instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. <u>Id</u>.  The court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process. <u>United States v. Frady</u>, 456 U.S. 152, 169 (1982), *citing* <u>Henderson v, Kibbe</u>,  431 U.S. 145, 154 (1977).  Furthermore, even if it is determined that the instruction violated the petitioner's right to due process, a petitioner can only obtain relief if the unconstitutional instruction had a substantial influence on the conviction and thereby resulted in actual prejudice under <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993) (whether the error had a substantial and injurious effect or influence in determining the jury's verdict.). <u>Hanna v. Riveland</u>, 87 F.3d 1034, 1039 (9th Cir. 1996).  The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal.  <u>Id</u>. In addition, the Court notes that Petitioner's burden is "especially heavy" with this claim, because "[a]n omission or an incomplete instruction is less likely to be prejudicial than a misstatement of law." <u>Henderson v. Kibbe</u>, 431 U.S. 145, 155 (1977).

It is clear Petitioner is not entitled to federal habeas relief on this claim, because Petitioner has not demonstrated that the trial court's failure to instruct the jury on another crime was contrary to, or an unreasonable application of clearly established Supreme Court precedent. As pointed out by Respondent, there is no Supreme Court authority which requires a trial court to instruct the jury on offenses that were not charged, of which Petitioner may be guilty. <u>Windham v. Merkle</u>, 163 F.3d 1092, 1106 (9th Cir.1998); <u>Turner v. Marshall</u>, 63 F.3d 807, 819 (9th Cir.1995). In addition, the trial court did not deprive Petitioner of her right to present a defense by failing to instruct on other offenses. The jury was instructed that if the evidence was insufficient to find Petitioner committed the charged offense beyond a reasonable doubt, then they should acquit Petitioner of the charged offense. Accordingly, the claim is without merit and should be denied.

**E.  Ground Five**

In her next claim, Petitioner argues the trial court erred by failing to sua sponte instruct the jury on the lesser-included offenses of second degree murder and voluntary manslaughter. Respondent also contends that this claim is unexhausted, because Petitioner failed to raise it in her petition for review to the California Supreme Court. Respondent urges the Court to nonetheless reject it as meritless. 28 U.S.C. § 2254(b)(2).

The claim was discussed by the Fifth DCA as follows:

> In an alternative claim to her argument that substantial evidence does not support her convictions, Dyer argues the trial court erred in failing sua sponte to give lesser included instructions for second degree murder and voluntary manslaughter. In particular, she argues there was evidence that D.J. had attempted to sexually assault her and thus her reason for killing D.J. was not tied to the felonies of robbery, carjacking, and kidnapping but was an independent reason to kill him. Thus, she contends the evidence was sufficient to support an intentional killing without premeditation and deliberation. In addition, she argues that the heat of passion engendered by the attempted sexual assault was sufficient to warrant an instruction on voluntary manslaughter.

> Cruz testified that Lopez said the "dude tried to rape home girl, so they beat him up and threw him in the back of the truck." Lopez said they were waiting for someone to come. When Dyer was questioned by law enforcement, she was asked if D.J. tried to rape her or do anything to her in the truck. She said, no. She added, "nobody ever tried to rape me." During Dyer's jailhouse conversation with Ortega she told him that the police thought that D.J. had raped her.

> Assuming that the premise of Dyer's argument is true-that D.J. tried to rape her and the killing was a response to this-the evidence was not sufficient to support instructions on second degree murder and/or voluntary manslaughter.

> "'Speculation is an insufficient basis upon which to require the giving of an instruction on a lesser included offense.'" (*People v. Sakarias* (2000) 22 Cal.4th 596, 620, 94 Cal.Rptr.2d 17, 995 P.2d 152.) ... '[T]he existence of "any evidence, no matter how weak" will not justify instructions on a lesser included offense....' (*People v. Breverman* [ (1998) ] 19 Cal.4th [142, 162].) Rather, substantial evidence must exist to allow a reasonable jury to find that the defendant is guilty of a lesser but not the greater offense. [Citation.] "Substantial evidence is evidence sufficient to 'deserve consideration by the jury,' that is, evidence that a reasonable jury could find persuasive." [Citation.] (*People v. Valdez* (2004) 32 Cal.4th 73, 116, 8 Cal.Rptr.3d 271, 82 P.3d 296.)

> While we agree with Dyer that the evidence may have supported another theory of murder other than the only charged theory of first degree felony murder, we do not find that theory to be second degree murder or voluntary manslaughter. The evidence was susceptible to a theory that Dyer was guilty of first degree premeditated and deliberate murder.

> Murder is defined as an unlawful killing committed with malice aforethought. (§ 187, subd. (a).) An unlawful killing with malice aforethought, perpetrated by certain specified means or that is willful, deliberate, and premeditated, constitutes murder in the first degree. (§ 189.) A killing in the course of the commission of certain enumerated felonies also constitutes murder in the first degree. (§ 189.)

"Second degree murder is an unlawful killing with malice aforethought, but without the elements that elevate an unlawful killing to first degree murder. (§§ 187, subd. (a), 189; ...) In addition, an unlawful killing in the course of the commission of a felony that is inherently dangerous to human life but is not included among the felonies enumerated in section 189, constitutes at least murder in the second degree." [Citation.]

"Malice may be express or implied. Malice is express 'when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature.' (§ 188.) It is implied 'when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart.' [Citation.] More specifically, 'malice is implied "when the killing results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." [Citation.]' [Citation.] An unlawful killing may constitute manslaughter rather than murder even in the presence of intent to kill or conscious disregard for life, however, if the defendant killed in a 'sudden quarrel or heat of passion' (§ 192, subd. (a);)." (*People v. Robertson* (2004) 34 Cal.4th 156, 164-165, 17 Cal.Rptr.3d 604, 95 P.3d 872.)

We begin by noting that evidence that D.J. attempted to sexually assault Dyer was weak, at best. But if we assume this evidence was credible, and as Dyer argues, she was not involved in the felonies but wished to kill D.J. because he attempted to rape her, the evidence establishes nothing less than a willful, deliberate, and premeditated killing. Dyer stayed with the truck, with D.J. under the truck bed, for several hours. She phoned Ortega numerous times. When Ortega arrived she accepted the gun from him, rode out to the country in D.J.'s truck, and shot him three times in the head. One shot was to the left back side of the head, one to the left top of the head, and one to the front of the face, each shot being fired from a different angle. In this scenario, as set forth by Dyer, the killing could not be anything less than a willful, deliberate, and premeditated killing.

Next Dyer argues that under this same scenario she was acting under the heat of passion when she killed D.J. "'[I]f sufficient time has elapsed between the provocation and the fatal blow for passion to subside and reason to return, the killing is not voluntary manslaughter....' [Citation.]" (*People v. Breverman* (1998) 19 Cal.4th 142, 163, 77 Cal.Rptr.2d 870, 960 P.2d 1094.) Under the scenario set forth by Dyer the jury could only reasonably conclude that sufficient time had elapsed between the provocation and the fatal blow for the passion to have subsided and for Dyer to return to reason. Several hours passed between the alleged attempted sexual assault and the killing. During this time D.J. was held captive and was not in any position to reignite the passion. Dyer was surrounded by others. Numerous activities occurred in the interim between the alleged sexual assault and the killing. Dyer called Ortega numerous times and Ortega showed up with a gun. This evidence does not come close to suggesting a passionate crime, but points directly to a well-thought-out plan. There was no evidence presented to the jury from which it could be reasonably persuaded to find second degree murder or voluntary manslaughter. The trial court did not err in failing to instruct sua sponte on second degree murder or voluntary manslaughter.

(LD 1: 23-26.)

As with Ground Four above, this claim is meritless because there is no Supreme Court authority which requires instruction on a lesser-included offense in a non-capital case. Windham, 163 F.3d at 1106; Turner, 63 F.3d at 819. In addition, as thoroughly discussed by the appellate court, the evidence did not support lesser offense instructions requested by Petitioner. Accordingly, the

1    claim should be rejected.

2         **F. Ground Six**

3         Petitioner next contends the trial court erred in limiting co-defendant Ortega's defense

4    counsel's cross-examination of Cruz.

5         This claim was presented and rejected on direct appeal in the Fifth DCA. (LD 1:26-28.) The

6    claim was then presented to the California Supreme Court where it was summarily denied. (LD 7, 8.)

7    The California Supreme Court is presumed to have denied the claim for the same reasons stated in

8    the opinion of the Fifth DCA.  Ylst, 501 U.S. at 803.

9         The appellate court rejected this claim as follows:

10        After Cruz was arrested, he was interviewed numerous times by law enforcement.
          During one interview he was granted limited immunity status and anything he said during
11        that interview could not be used against him. He declined to enter into a plea bargain with
          the People at that time. He was tried with Castro and Romero for the murder of D.J. Cruz
12        testified on his own behalf at that trial. Prior to jury deliberations, Cruz decided to accept the
          People's offer to plead guilty to one count of robbery with a gun enhancement. In exchange
13        for the plea agreement, Cruz was required to testify truthfully at the trial of the remaining
          codefendants.

14
          As previously set forth Cruz testified at this trial. During the cross-examination of
15        Cruz by counsel for Ortega, Cruz admitted to lying to law enforcement even though he
          promised he was telling the truth. Cruz explained that he was testifying truthfully because
16        now he was testifying under oath, yet his explanation of giving truthful testimony under oath
          was impeached with testimony from the previous trial where he testified under oath and then
17        changed his testimony under oath.

18        During his cross-examination by counsel for Ortega, the following exchange took
          place:
19
          "Q [Counsel for Ortega] ... So when you take oath to tell the truth, you realize that
20        that's important that you not tell a lie; right?

21        "A [Cruz] Yeah.

22        "Q Besides that, you have a contract with the District Attorney's office; isn't that
          right?
23
          "A Yeah.
24
          "Q And that contract can be broken if you don't tell the truth; correct?
25
          "A Yeah.
26
          "Q But it's the District Attorney who decides whether you tell the truth; isn't it?
27
          "MR. PETERSON [District Attorney] Objection, calls for a legal conclusion.
28

1     "THE COURT: Sustained.

2     "MR. HODGKINS [Counsel for Ortega] Q Mr. Cruz, do you know that it is perjury to lie under oath?

3

4     "A Yes, I do.

    "Q Okay. And do you know who would be involved in prosecuting that perjury if you didn't tell the truth?

5

6     "A Yes.

7     "Q Who?

8     "A The judge.

9     "Q Don't you know that the District Attorney prosecutes crimes in the County of Fresno?

10

11     "A Yeah.

    "Q And wouldn't the District Attorney be the one to prosecute a false testimony under oath by you?

12

13     "MR. PETERSON: Objection, argumentative at this point.

14     "THE COURT: It is. Sustained."

15     Dyer claims that the trial court violated her right to cross-examination when it refused to allow defense counsel to cross-examine Cruz about his contract with the district attorney's office. Dyer characterizes the above exchange as "[t]he prosecutor repeatedly objected to this line of questioning and the trial court sustained all of his objections." Dyer claims that this purported error also precluded the defense from questioning Roman regarding his plea agreement with the prosecution because any questioning would have been futile. Dyer claims that the trial court's limitation of cross-examination of Cruz and Roman denied her the right to confront the two main witnesses for the prosecution.

16

17

18

19

20     Dyer places primary reliance on the case of *U.S. v. Schoneberg* (9th Cir.2005) 396 F.3d 1036. This case does not aid Dyer's argument. We are not bound by a federal circuit court opinion. (*People ex. rel. Renne v. Servantes* (2001) 86 Cal.App.4th 1081, 1090, 103 Cal.Rptr.2d 870.)

21

22     When a witness has agreed to testify as part of a plea bargain, his motive for testifying is relevant. (*People v. Alvarez* (1996) 49 Cal.App.4th 679, 688, 56 Cal.Rptr.2d 814.) The California Supreme Court has held that any agreement bearing on a witness's credibility, including the consequences to the witness of failure to testify truthfully, must be fully disclosed to the jury. But, the precise mechanism whereby the truthfulness of a witness's testimony would be determined at a later time is not a matter for the jury's concern. (*People v. Fauber* (1992) 2 Cal.4th 792, 823, 9 Cal.Rptr.2d 24, 831 P.2d 249.)

23

24

25

26     The two questions objected to by the prosecutor and sustained by the trial court fall within the area that our Supreme Court has determined is not a matter for the jury's concern. The sustaining of the objections was proper. There is no showing that any of the defendants were precluded from asking further questions regarding the consequences to Cruz or Romero if they did not testify truthfully or any other terms of their plea agreements.

27

28

1   (LD 1:26-29.)

2        The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal

3   prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."

4   U.S. Const. am. VI.  The Sixth Amendment's Confrontation Clause was made applicable to the states

5   through the Due Process Clause of the Fourteenth Amendment.  Pointer v. Texas, 380 U.S. 400,

6   403-05 (1965). The Confrontation Clause gives a defendant the right "to be confronted with the

7   witnesses against him." Id. "[T]he Confrontation Clause guarantees only 'an opportunity for

8   effective cross-examination, not cross-examination that is effective in whatever way, and to

9   whatever extent, the defense might wish.'" Kentucky v. Stincer, 482 U.S. 730, 739 (1987), quoting

10  Delaware v. Fensterer, 474 U.S. 15, 20 (1985).  The Confrontation Clause does not prevent a trial

11  judge from imposing "reasonable limits on such cross-examination based on concerns about, among

12  other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that

13  is repetitive or only marginally relevant." Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986); Crane

14  v. Kentucky, 476 U.S. 683, 689-90 (1986). Nevertheless, the Court has held that a defendant's

15  Confrontation Clause rights have been violated when he is "prohibited from engaging in otherwise

16  appropriate cross-examination ... and thereby 'to expose to the jury the facts from which jurors ...

17  could appropriately draw inferences relating to the reliability of the witness.'" Id. at 680, quoting

18  Davis v. Alaska, 415 U.S. 308, 318 (1974).

19        In this case, it is clear the trial court did not prevent Petitioner from cross-examining Cruz

20  regarding Cruz's plea agreement. Petitioner focuses on the exchange set forth above wherein the

21  prosecution interposed two objections. As discussed by the appellate court, those objections were

22  properly sustained because defense counsel was delving into legal questions that were not properly

23  before the jury for consideration. The trial court did not bar defense counsel from questioning the

24  witness on the subject of the plea bargain itself. In fact, defense counsel thoroughly cross-examined

25  Cruz on the plea agreement and Cruz's motivation to lie later in the trial, as evidenced by the

26  following excerpt from the record:

27        Q. [Defense counsel]: But as of November 21st, 2002, you didn't have a written contract with
          the District Attorney's office to plead to a lesser charge; did you?

28

1   A. [Witness Cruz]: No.

2   Q. You were still facing first degree murder charges and robbery charges and kidnapping charges with regard to this incident involving DJ Hunter; weren't you?

3   A. Yeah.

4

5   Q. And during November 21st, 2002 you agreed to the interview because you wanted to be able to enter into an agreement with them later for a lesser charge other than what you were charged with at that point in time; isn't that right?

6   A. Yes.

7

8   Q. Okay. That was your purpose in going forward with the interview on November 21st; correct?

9   A. Yeah.

10   Q. Okay. And subsequent to that point in time, you had a trial which occurred in Department 54; isn't that right?

11   A. Yeah.

12

13   Q. And you were sitting at the counsel table with your own attorney, and there were two other individuals who were could [sic] co-defendants with you; isn't that correct?

14   A. Yeah.

15   Q. And what were there [sic] names?

16   A. Martin Castro, Jose David Ramiro.

17   Q. Martin Castro and Jose David Ramiro; correct?

18   A. Yeah.

19   Q. And [the] three of you were charged with murder, robbery, and kidnapping; correct?

20   A. Yeah.

21   Q. And special circumstances; right?

22   A. Yeah.

23   Q. And isn't it true that you've learned that special circumstances could mean if they are found true by a jury, that you would never get out of prison. Life without possibility of parole.

24

25   A. Yeah.

26   Q. And you knew that at the time that you were sitting at this counsel table in trial on those charges; isn't that correct?

27   A. Yeah.

28

1   Q. Now, as you go through this trial - - as the trial's going - - your trial over there is going through, you still haven't entered into any agreement with [the prosecutor ] Mr. Peterson,
2   have you?

3   A. No.

4   Q. Excuse me. Your answer - - you said no, didn't you?

5   A. At the end we did.

6   Q. Yeah, I know. As you're going through the trial before you got to the end, you didn't have any agreement with Mr. Peterson; did you?
7
    A. No.
8
    Q. But you knew that there was an offer on the table with Mr. Peterson to plead to certain
9   lesser charge if you would agree to testify; isn't that right?

10  A. Yeah.

11  Q. And wasn't it true that you were told that this agreement to let you plead to a robbery with vicarious use of a gun facing six, seven, eight years at the most would only be on the table
12  until that case went to the jury. And if you didn't accept it before it went to the jury, the offer was off the table, and you couldn't have it; isn't that right?
13
    A. Yes.
14
    Q. Now, before an agreement was entered into and you agreed to work with the District
15  Attorney's office while you're still charged over here as a defendant, you took the stand and testified under oath; didn't you?
16
    A. Yeah.
17
    Q. The same as you're testifying to here right now; right?
18
    A. Yeah.
19
    Q. Your testimony went from the morning to the afternoon; didn't it?
20
    A. Yeah.
21
    Q. Okay. And during the morning, weren't you questioned as to whether or not Martin Castro
22  was there that night at Ramiro Roman's house? And you testified under oath, no, he was not there?
23
    A. I don't recall.
24
    Q. You don't recall. Do you recall coming back after lunch and saying - - after you had
25  entered into an agreement with Mr. Peterson, the District Attorney, and saying, "Yeah, Martin Castro was there that night."
26
    A. I never had agreement with him. I did it - - I came up here by my own.
27
    Q. You what?
28

1    A. I came up here on my own.

2    Q. Okay. But what I'm trying to get at is, didn't you make one statement about Martin Castro
     in the morning while you were testifying and then a completely different statement about him
3    being there in the afternoon?

4    A. Yeah.

5    Q. And both of those statements were under oath; is that correct?

6    A. Yeah.

7    Q. Now, Mr. Cruz, you told me early on when I started questioning you, you said you saw a
     difference between telling a lie to Detective Chapman and telling a lie under oath; isn't that
8    correct?

9    A. Yeah.

10   Q. You indicated to me that it's a higher plane to testify under oath, and you felt a bigger
     obligation to tell the truth; isn't that correct?
11
     A. Yeah.
12
     Q. But you lied under oath at your own trial while testifying; didn't you?
13
     A. Yeah.
14
     (See Ortega v. Evans, Case No. 1:08-CV-00894 LJO DLB HC, RT 5877-5881.)
15
          Thereafter, defense counsel proceeded to impeach Cruz with the various contradictions and
16
     falsifications in his testimony. (RT 5881-5886.) From this exchange it is clear the court did not
17
     prohibit the defense "from engaging in otherwise appropriate cross-examination ... and thereby 'to
18
     expose to the jury the facts from which jurors ... could appropriately draw inferences relating to the
19
     reliability of the witness.'" Van Arsdall, 475 U.S. at 680, quoting Davis v. Alaska, 415 U.S. 308, 318
20
     (1974). Defense counsel thoroughly cross-examined Cruz regarding the plea bargain and Cruz's
21
     motivation for testifying. The state court rejection of this claim was not contrary, or an unreasonable
22
     application of, Supreme Court precedent. The claim should be rejected.
23
          **G.  Ground Seven**
24
     This claim was dismissed by the Court on February 26, 2009.
25
          **H.  Ground Eight**
26
          Petitioner next claims trial counsel was ineffective in failing to investigate and in failing to
27
     interview her prior to bringing a motion to suppress her statements made to police. The record shows
28

that days after the motion to suppress was brought and denied by the trial court, defense counsel

attempted to relitigate the motion:

> I had another issue, Your Honor. My client's had a chance to think over the testimony from last week. And I learned today - - and this has to do with *Miranda* motion we did. And as an offer – I'm asking to reopen that. And as an offer of proof I would tell the Court that if [Petitioner] were called to testify, shw would say that when she went to the lady's room, she did not go alone. She was escorted by Detective Rasmussen. And in fact, the ladies went into the lady's room together. That she was not free to roam around. The other thing being - - I don't know if the court used this in their decision or not because I don't recall the exact words. Whether the Court thought that there was no evidence that she was placed in the back of the patrol car at 10:40 and stayed there until they got downtown some time at midnight or little after midnight. Once we brought up the *Miranda* issue, the burden shifted to the District Attorney to prove that the questioning did not violate *Miranda*. And what I recall the evidence was that Chapman said he saw her in the vehicle when they came there about 11:00. I would like to put that officer on who placed her in the vehicle to say that she was in that vehicle the whole time, and she could not get out. Chapman did testify that what he knows about sheriff's cars, you can't get out of the back seat. And that is where she was. So if the Court used that hour and a half or so in their decision making to decide that she wasn't in custody or from an objective view nobody would think that they were in custody, I think I really need to ask to put that officer on to show that she was placed in the back of that vehicle, and she couldn't get out. So those were the two issues. And these issues came up because [Petitioner] thought about it this weekend. And of course, in the last two years she's been pretty upset and has forgotten a lot of stuff. But she recalled this about the detective and the lady's room, also.

(See Ortega v. Evans, Case No. 1:08-CV-00894 LJO DLB HC, RT 3033-34.)

The trial court considered defense counsel's argument and denied the motion to relitigate the

motion to suppress. (RT 3037.)

This claim was presented in a habeas petition to the Fresno County Superior Court. (LD 9.)

The superior court denied the claim in a reasoned decision, stating:

> Petitioner has delayed in bringing her petition. A petitioner must explain any delay in seeking relief through a petition for writ of habeas corpus. [Citation.] Here, petitioner admits that her direct appeals were completed in June of 2007, yet she did not file the present petition until June of 2008, about a year later. Petitioner claims that it took her several months to obtain her trial transcripts after her appeals were completed. Yet regardless of how long it took petitioner to obtain her transcripts, she could have brought her petition sooner because she was already familiar with the facts of her own case.
>
> Petitioner claims that her attorney failed to investigate adequately before bringing the suppression motion, yet petitioner has not stated any facts showing that the trial court would have been more likely to grant the suppression motion if the petitioner's attorney had conducted further investigation.

(LD 10.)

Petitioner then filed a habeas petition in the Fifth DCA. (LD 11.) The Fifth DCA denied the

petition, stating as follows:

[The petition] is conclusional, speculative, and unsupported by relevant documentation or citation to the applicable portions of petitioner's appellate record []. Petitioner has also failed to meet her burden of showing, as a demonstrable reality, that her trial attorney's failures prejudiced her.

(LD 12.)

Petitioner then filed a habeas petition in the California Supreme Court. (LD 13.) The petition was summarily denied on April 1, 2009. (LD 14.) The California Supreme Court is presumed to have denied the claim for the same reasons stated in the courts below.  Ylst, 501 U.S. at 803.

The law governing ineffective assistance of counsel claims is clearly established for the purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d).  Canales v. Roe, 151 F.3d 1226, 1229 (9th Cir. 1998).  In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the court must consider two factors.  Strickland, 466 U.S. at 687; Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994).  First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland, 466 U.S. at 687.  The petitioner must show that counsel's representation fell below an objective standard of reasonableness, and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances. Id. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1348 (9th Cir. 1995).  Judicial scrutiny of counsel's performance is highly deferential.  A court indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.  Strickland, 466 U.S. at 687; Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir.1994).

Second, the petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result ... would have been different," Strickland, 466 U.S. at 694. Petitioner must show that counsel's errors were so egregious as to deprive defendant of a fair trial, one whose result is reliable.  Id. at 688.  The court must evaluate whether the entire trial was fundamentally unfair or unreliable because of counsel's ineffectiveness.  Id.; Quintero-Barraza, 78 F.3d at 1345; United States v. Palomba, 31 F.3d 1356, 1461 (9th Cir. 1994).

A court need not determine whether counsel's performance was deficient before examining

1   the prejudice suffered by the petitioner as a result of the alleged deficiencies.  Strickland, 466 U.S. at

2   697.  Since the defendant must affirmatively prove prejudice, any deficiency that does not result in

3   prejudice must necessarily fail. However, there are certain instances which are legally presumed to

4   result in prejudice, e.g., where there has been an actual or constructive denial of the assistance of

5   counsel or where the State has interfered with counsel's assistance. Id. at 692; United States v.

6   Cronic, 466 U.S., at 659, and n.25 (1984).

7        Ineffective assistance of counsel claims are analyzed under the "unreasonable application"

8   prong of Williams v. Taylor, 529 U.S. 362 (2000).  Weighall v. Middle, 215 F.3d 1058, 1062 (2000).

9   "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state

10  court identifies the correct governing legal principle from [United States Supreme Court] decisions

11  but unreasonably applies that principle to the facts of the prisoner's case."   Williams, 529 U.S. at

12  413.  The habeas corpus applicant bears the burden to show that the state court applied United States

13  Supreme Court precedent in an objectively unreasonable manner.   Price v. Vincent, 538 U.S. 634,

14  640 (2003).

15       Petitioner fails to show that counsel's alleged failure was error. A review of the record

16  reveals that Petitioner's memory was refreshed after the motion was initially heard, and Petitioner

17  then brought the information to her counsel's attention. As pointed out by Respondent, if Petitioner

18  knew the information beforehand or became aware of it at the hearing, presumably she would have

19  brought it to counsel's attention at the hearing. Petitioner's later recollection of the additional details

20  appears contrived. In any case, Petitioner fails to demonstrate prejudice resulting from counsel's

21  alleged error. Petitioner did not admit to the kidnap and murder of the victim in her statement to

22  police. In fact, she denied having anything to do with it. Rather, the strong evidence inculpating

23  Petitioner came from co-defendants and witnesses, as well as Petitioner's secretly recorded

24  conversation with Ortega in jail. For these reasons, the state court rejection was not an unreasonable

25  application of Supreme Court precedent, and this claim should also be denied.

26  **I.  Ground Nine**

27       Finally, Petitioner argues that a juror who was hearing-impaired should have been excused

28  for cause.

This claim was also presented in habeas petitions to the state courts. The superior court rejected the claim as follows:

> Also, although petitioner argues that her attorney failed to excuse a hearing-impaired juror for cause because the juror was not able to observe the witnesses' body language and watch her interpreter at the same time, petitioner has not stated any facts showing that the juror was unable to effectively evaluate the witnesses' testimony and credibility. If taken to its logical extreme, petitioner's argument would effectively bar all hearing-impaired persons from serving on juries. Clearly, the court cannot sanction this result.

(LD 10.)

The state court rejection of this claim was not unreasonable. Petitioner does not provide anything to support her claim that the juror was unable to function as a juror, and the record shows the juror could communicate effectively with a sign interpreter. (LD 4: 93-94.) Not only is the claim unsupported and speculative, but as explained by the state court, taken to its logical end Petitioner's argument would bar all hearing-impaired jurors. Cal. Civ. Proc. Code § 203(a)(6) states that "no person shall be deemed incompetent solely because of the loss of sight or hearing in any degree or other disability which impedes the person's ability to communicate . . . ." There is no Supreme Court authority that bars hearing-impaired individuals from serving as jurors. Indeed, removing a deaf juror based solely on her disability without regard to her ability to communicate would violate her right to equal protection. This claim should be rejected.

## RECOMMENDATION

Accordingly, IT IS HEREBY RECOMMENDED that the petition for a writ of habeas corpus be DENIED WITH PREJUDICE. It is FURTHER RECOMMENDED that the Clerk of Court be DIRECTED to enter judgment.

This Findings and Recommendation is submitted to the assigned District Judge, pursuant to the provisions of Title 28 U.S.C. § 636(b)(1). Within thirty days after being served with the Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Any reply to the objections shall be served and filed within ten days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d

1    1153 (9th Cir. 1991).

2

3    IT IS SO ORDERED.

4    **Dated:    October 8, 2009**                              **/s/ Sandra M. Snyder**
                                                UNITED STATES MAGISTRATE JUDGE

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28